**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| BLUEBERRY FUNDING, LLC,<br><br>Plaintiff,<br>v.<br><br>FLAGSTAR BANK, N.A., individually and as successor in interest to SIGNATURE BANK,<br><br>Defendant. | Civil Action No.:<br><br>**COMPLAINT AND JURY DEMAND** |

Plaintiff, Blueberry Funding, LLC ("Blueberry"), by way of Complaint against Defendant Flagstar Bank, N.A., hereby alleges as follows:

**PRELIMINARY STATEMENT**

1. Defendant, Flagstar Bank, knowingly assisted its customer, an attorney, in diverting, misappropriating and manipulating funds in his trust account to enrich himself and his associates in the hundreds of millions of dollars.

2. The attorney, Mark Nussbaum, was the principal architect of this widespread and years' long scheme. He has since been charged with grand larceny for it.

3. Blueberry was a customer of Flagstar and its predecessor, the now-defunct Signature Bank. With Flagstar's indispensable assistance, Nussbaum and his confederates stole Blueberry’s funds on deposit in Nussbaum's trust account. None of this could have occurred without Flagstar's help.

4. Nussbaum admitted to the bank, in writing, that he was transferring funds between accounts to manipulate balances for the purpose of deceiving clients. Whenever a client asked to see the balance of the escrow account, he moved money between accounts to control what that client would see. (He admitted this in February 2023, and on March 20, 2023, Flagstar acquired the account, and the admission with it.)

5. Flagstar's compliance department flagged a multitude of facially illegitimate transactions that, by Flagstar's own account, were never adequately explained. This included a payment that Nussbaum made to his mother from the trust account, and a series of transfers to interconnected entities who maintained Flagstar accounts.

6. Even a third-party bank alerted Flagstar to possible fraud in a wire transaction from the trust account.

7. Despite all of this, Flagstar took no meaningful steps to intervene in any way.

8. Flagstar and its officers' financial interest in retaining a highly lucrative client led them to accommodate him, even if it meant complicity in his schemes.

9. Blueberry is a bridge lender and a Flagstar client.

10. Blueberry's loans to borrowers were funded with money that it deposited into Nussbaum's attorney escrow account at Flagstar that was maintained by his law firm, Nussbaum Lowinger. The account was primarily controlled by Nussbaum.

11. The loan documents required that Blueberry's funds be held in the trust account, and strictly prohibited any transfer of those funds without Blueberry's express consent, except to pay off the loans extended by it.

12. Flagstar knew that Nussbaum was not safeguarding the money, but continued processing transactions through the account, before, during and after learning of the misuse of the

funds, flagging a series of suspicious transactions for which there was no explanation, and receiving a fraud alert from a third-party bank.

13. On February 27, 2023, the bank's compliance officer wrote to Nussbaum questioning a series of inexplicable suspicious transactions in the trust account.

14. In response, Nussbaum admitted that he transferred money between his firms' accounts to control what balance a client would see if they asked.

15. Nussbaum was accessing and manipulating funds in a fiduciary account, and now Flagstar undeniably knew it.

16. Flagstar's compliance department questioned the account yet again on June 12, 2023. Nussbaum either did not provide answers or provided inadequate ones. Despite this, Flagstar continued processing transactions through the trust account uninterrupted.

17. By July 27, 2023, Flagstar had discovered that Nussbaum had wired funds to his mother. Although they requested documentation justifying the transfer, there is no record that Nussbaum ever provided it. Yet again, Flagstar took no steps to intervene.

18. The private-client bankers who ran the relationship likewise did nothing to slow down Nussbaum's diversion and manipulation of the escrowed funds either. Their actions facilitated it because they had a financial incentive to retain Nussbaum as a client.

19. The bankers routinely raised wire limits without question, usually within minutes of Nussbaum's requests, and did so even after Flagstar's compliance department and a third-party bank flagged transactions for possible fraud.

20. Between May 2023 and October 2024, Flagstar's bankers raised the wire limit at least six times, to as much as $20,150,000, never once asking what a wire was for.

21. In the midst of all of this, Blueberry and its affiliate wired $15,500,000 from their own Flagstar accounts into the trust account, specifically, $8,000,000 on July 17, 2023 and $7,500,000 on August 24, 2023.

22. According to Flagstar's statements, each of Blueberry's deposits were drained from the account within days, and by September 20, 2023, the entire trust account, for every client combined, held only $859,895.74.

23. The bankers had reason to, and did, look away from all of this. According to Nussbaum, the compensation of the officers who serviced his firm's accounts was based, in part, on the deposits made into the accounts.

24. Blueberry remained in the dark about what Flagstar knew. And Nussbaum actively concealed it from them.

25. On November 13, 2023, Blueberry's controller wrote that $38,000,000 of its funds were sitting in escrow, and Nussbaum did not dispute that. He wrote that the money "has to be in escrow." That day, the whole account held $10,500,032.89, less than a third of that amount.

26. Later, in an escrow agreement dated August 21, 2024, Nussbaum's firm represented that it held $58,772,945 of Blueberry's funds in escrow. That day, however, the whole trust account held only $7,020,537.01.

27. Nussbaum has since admitted under oath that roughly $336,731,000 (of more than $437,630,000 on deposit) of depositors' money was transferred to companies affiliated with real estate investor Mendel Steiner ("Steiner").

28. It would later be revealed that Nussbaum was working with Steiner to plunder the Trust Account which, as it turned out, was merely a conduit to him.

29. Nussbaum could not have done this without a bank that would hold the money, move it on request, and look away from what its own compliance department had found.

30. Blueberry's net loss from the scheme Flagstar aided, after deducting all interest it received, is $58,772,945.

31. Blueberry sues Flagstar for aiding and abetting breach of fiduciary duty, aiding and abetting fraud, negligence and unjust enrichment. Every material factual allegation below is drawn from Flagstar's own account records, the bank's own compliance correspondence, or documents produced in related actions, and the sources are identified.

## THE PARTIES AND RELEVANT NON-PARTIES

32. Plaintiff, Blueberry Funding LLC ("Blueberry"), is a Delaware limited liability company with a principal place of business in Lakewood, New Jersey. Blueberry is, and at all relevant times was, a client and accountholder at Flagstar, maintaining multiple Flagstar accounts, and serviced by Flagstar's Private Client Group 353.

33. Blueberry's banking relationship with Flagstar was situated in New Jersey. After Flagstar acquired Signature's deposits, as detailed below, Flagstar's New Jersey office took over Blueberry's accounts and serviced them from New Jersey.

34. Operationally, Blueberry is a New Jersey business in every respect. Although formed and registered in Delaware, Blueberry's office, personnel and operations are, and were, at all relevant times, in Lakewood, New Jersey, and its lending business is run from there. Blueberry's officers, employees and books and records are located there.

35. Flagstar Bank N.A. ("Flagstar"), is a national banking association chartered under the laws of the United States, with its main office, as designated in its articles of association,

located in Hicksville, New York, and registered, licensed and authorized to do business in New Jersey.

36. Signature Bank ("Signature"), a New York state-chartered bank, is the predecessor in interest to Flagstar. At all relevant times prior to March 12, 2023, the trust account described herein was maintained at Signature.

37. On March 12, 2023, the New York State Department of Financial Services closed Signature, and appointed the Federal Deposit Insurance Corporation as receiver. On or about March 20, 2023, Flagstar acquired substantially all of the deposits and certain assets and liabilities of Signature pursuant to a purchase and assumption agreement. The banking relationships described herein, the accounts, account records and personnel who serviced them continued at Flagstar without interruption.

38. Non-party, Mark J. Nussbaum ("Nussbaum"), was the principal and operator of Nussbaum Lowinger LLP and of Mark J. Nussbaum & Associates PLLC (collectively, the "Law Firms"), and was a signatory on, and controlled, the trust account into which Blueberry's funds were deposited, and from which they were stolen. (Nussbaum maintained two attorney trust accounts, one with account number ending in 1550 (the "Trust Account"), and the other with account number ending in 1964 (together with the Trust Account, the "Trust Accounts"). The Blueberry transfers were made into account number 1550).

39. In May 2025, the New York County District Attorney charged Nussbaum with grand larceny in connection with the theft of client escrow funds. He has pleaded not guilty.

40. Non-party, Samuel Lowinger ("Lowinger"), is an attorney and a named partner of Nussbaum Lowinger LLP. Upon information and belief, Lowinger shared signatory and

supervisory authority over the Trust Account, and prepared and transmitted account communications on which depositors, including Blueberry, relied.

41. Nussbaum, Lowinger and the Law Firms maintained, and were the purported custodians of, the Trust Account described herein at Signature, and later, at Flagstar. Nussbaum and Lowinger solicited lenders' funds into the Trust Account.

42. The scheme described here also ran through a constellation of shell and conduit accounts that Flagstar and its predecessor banked or transacted with, including MJNT Properties LLC, whose Flagstar-era account received and returned $3,300,000.00 from the Trust Account on a single day; ZLB Capital LLC, which received $15,000,000.00 from the Trust Account and returned it the next day under the reference "Leo Brody"; check-writing entities identified in the bank's own compliance correspondence only by initials, K.I.S. Inc., C.K.Y Inc., C.D.R. Inc., R.S.O.I.S., and C.K.C.U.; and religious congregations used as wire counterparties.

43. Non-party, Bluberry Capital Inc., is an entity affiliated with Blueberry that also advanced funds to the Trust Account. The claims arising from that transfer belong to Blueberry which is asserting those claims on its behalf.

44. All transfers from an account held in the name of a Blueberry affiliated entity or funding source, were made for Blueberry's account and benefit. Blueberry was the lender, the beneficial funding party or the party entitled to repayment on those transfers, and bore the economic loss when the funds were not returned.

**JURISDICTION AND VENUE**

45. This Court has subject matter jurisdiction pursuant to 28 U.S.C. Section 1332(a) because the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

46. Flagstar is a national banking association whose main office, as designated in its articles of association, is in Hicksville, New York, and it is therefore a citizen of New York.

47. Blueberry is a limited liability company. Each of its members is, and was at the time this action was commenced, a citizen of New Jersey or Florida, as identified member by member in Blueberry's disclosure statement under Federal Rule of Civil Procedure 7.1(a)(2). No member of Blueberry is a citizen of New York.

48. This Court has specific personal jurisdiction over Flagstar because: (a) the harm to Blueberry and claims in this Complaint arise directly out of, and relate to, the specific business activities conducted by Flagstar in New Jersey; and (b) Flagstar purposefully directed its actions at New Jersey and residents of New Jersey.

49. Blueberry's claims stem from Flagstar's contacts with New Jersey in that Flagstar operates branch offices in New Jersey, Blueberry's deposit accounts at Flagstar and its affiliate's account, including each account from which the entrusted funds at issue were wired, were serviced by Flagstar's New Jersey office, the banking relationship between Blueberry and Flagstar was maintained by Flagstar's New Jersey office and documented by statements and communications that Flagstar delivered to Blueberry in New Jersey, the wires at issue were originated from New Jersey accounts by a New Jersey customer, and the fraud alleged here in which Flagstar participated and enabled, was targeted directly at a New Jersey resident.

50. These actions establish minimum contacts with New Jersey such that the exercise of jurisdiction comports with notions of fair play and substantial justice.

51. Venue is proper in this District pursuant to 28 U.S.C. Section 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District, including Flagstar's servicing, through its New Jersey office, of the accounts from which wires to the Trust Account were sent, its acceptance of deposits from, and execution of wires originated by, a business operating in this District, the delivery into this District of the account statements and communications through which Blueberry's banking relationship was conducted, and the economic injury to Blueberry, whose principal place of business is in Lakewood, New Jersey.

## FACTUAL BACKGROUND

### I. The Scheme

52. Beginning in 2021, Nussbaum and Steiner together solicited Blueberry to provide short term capital for prospective real estate transactions.

53. As was represented to Blueberry, Steiner brought supposed real estate deals to Nussbaum and Lowinger for funding and lending.

54. Nussbaum and Steiner claimed that Steiner needed to show, and have access to, capital for the purchase of real estate, and funds to potentially finance those purchases.

55. They proposed to utilize funds from Blueberry and its affiliates for that purpose. Blueberry funded those advances from its own accounts, including its accounts at Signature and, after March 20, 2023, at Flagstar.

56. Having been duped by Nussbaum and Steiner, Blueberry extended bridge loans to Steiner-affiliated borrowers with funds deposited into the Trust Account.

57. Each loan was backed by a promissory note that Steiner personally guaranteed. Each note named the Trust Account, maintained at Signature and then at Flagstar, as the place where Blueberry's principal was to be held.

58. The funds were to remain in the Trust Account, untouched, until specific real estate transactions were proposed, reviewed and approved by Blueberry, and the closing documents delivered.

59. Unbeknownst to Blueberry, the funds did not remain in the Trust Account. They were filtered out primarily to Steiner and Steiner-affiliated entities.

60. Nussbaum stole hundreds of millions of dollars of depositors' money, including $15,500,000 belonging to Blueberry at Flagstar.

61. The scheme involved a wide-ranging and tangled web of illicit transactions, all of which were run through the Trust Account.

62. Nussbaum used a number of different methods to accomplish his theft. He presented depositors with non-existent investment opportunities or fabricated real estate transactions, structured real estate transactions by fraudulently inflating purchase prices so that he (and his confederates) could pocket excess funds, made direct and unauthorized transfers of depositors' funds to Steiner, Steiner entities, Steiner family members and others, and manipulated funds through withdrawals from, and redeposits into, the Trust Account in a circular scheme designed to defraud lenders and others involved in real estate transactions.

63. As Nussbaum depleted the Trust Account through these various scams, he required a continuous stream of fresh deposits to meet legitimate withdrawals and interest payments. Blueberry represented that fresh money.

64. Nussbaum has since admitted under oath that new creditors' money coming into the Trust Account was used to return earlier creditors' deposits.

65. Thus, Blueberry was not solicited because a transaction needed funding. It was solicited because the Trust Account needed cash.

66. As revealed in communications from Nussbaum to co-conspirators, in as early as Spring 2022, the Trust Account was becoming dangerously depleted, and Nussbaum was desperately trying to attract new money. And he did.

67. Nussbaum was able to continue the scheme through early 2025 when the dominoes began to fall. The ultimate collapse was marked by Steiner's death on January 9, 2025. But the true extent of the scheme remained hidden. And Lowinger sought to keep it that way.

68. On or about January 10, 2025, following Steiner's death, Blueberry demanded the return of its funds.

69. Blueberry then received a letter from Lowinger on or about January 14, 2025, stating that the Trust Account "may have been illegally accessed and substantially depleted."

70. The letter falsely attributed the loss to some outside intruder rather than to Nussbaum's theft.

71. The concealment worked. Blueberry did not know, and had no reason to know, of Flagstar's role in these events until in or about late April 2026 when Flagstar's internal documents were revealed.

72. In a separate asset recovery case brought on behalf of the Law Firms, on January 27, 2026, Nussbaum submitted a sworn Affirmation in which he admitted that, for over approximately three years, creditors deposited in excess of $437,630,000 into his Trust Accounts,

that new depositors' money was used to cover legitimate withdrawals, and that roughly $336,731,000 was transferred to Steiner-affiliated entities without any consideration.

**II. Blueberry's Lending**

73. At various times during Blueberry's relationship with Nussbaum, the Trust Account held two classes of funds, namely, money that secured or funded Steiner-affiliated company loans, and money that was utilized in the ordinary course of Blueberry's short-term lending business as further detailed below. The latter are not at issue in this action.

74. Blueberry's bridge lending to the Steiner-affiliated borrowers was documented by a series of promissory notes, in the principal amounts of $4,500,000, $7,500,000, $11,000,000 and $26,500,000, each guaranteed by Steiner, together with a consolidation instrument prepared in or about December 2023 and January 2024 reciting existing notes, in the aggregate outstanding principal amount of $38,000,000.

75. Every one of those instruments contained the same covenant, in materially identical terms. The $7,500,000 note provides that, "The Principal Amount shall be disbursed to the Nussbaum Lowinger LLP Attorney Escrow Account IOLA at Flagstar Bank ("Escrow Account"). The Principal Amount shall not be transferred from the Escrow Account except to payoff (sic) the Loan without Lender's consent in Lender's sole and absolute discretion. Transfer of any amount of the Loan from the Escrow Account shall be an Event of Default under the Loan Documents." The instrument consolidating the notes contains the same covenant, strengthened to require the lender's written consent.

76. Blueberry's funds were required to be deposited and held in the Trust Account, and were not to be transferred without Blueberry's express consent in accordance with the loan terms.

77. On November 13, 2023, Steiner executed the $4,500,000.00 note as sole member of 446 Monroe LLC. Like all the others, this note likewise designated the account to hold deposits, and prohibited the transfer of funds without Blueberry's authorization and consent. On the same day Steiner signed the note, Nussbaum also confirmed in writing to Blueberry that "The money has to be in escrow."

78. Blueberry committed that principal from its own funds already held in the Trust Account, leaving $4,500,000.00 there for the loan while the balance that Nussbaum reported was wired back to Blueberry.

79. The loan documents and the transfers as reflected on Flagstar's records coincide precisely. The $11,000,000.00 note provides that interest accrues on the full principal from July 16, 2023, as if funded in full on that date. The following day, July 17, 2023, Blueberry wired $8,000,000.00 from its Flagstar account into the Trust Account.

80. The $7,500,000.00 note provides that interest accrues from August 24, 2023, and on that day, the $7,500,000.00 was wired from the Flagstar account of Bluberry Capital, Blueberry's affiliate, into the Trust Account.

81. Blueberry's personnel maintained a group message thread with Nussbaum, created on April 14, 2023 by Blueberry's accountant, for the stated purpose of tracking escrow transactions and balances. Nussbaum confirmed that the funds were required to be held in the Trust Account, and that $38,000,000 was then on deposit as Blueberry stated in the thread.

82. However, as of September 20, 2023, merely five months later, Flagstar's statements reflect that the Trust Account balance had fallen precipitously to $859,895.74.

83. On November 13, 2023, Blueberry's controller wrote in the message thread that Blueberry had "38 million sitting by you in escrow for Steiner," and proposed moving those funds into an interest-bearing savings account at Flagstar.

84. Nussbaum refused, writing, "The money has to be in escrow." He added that an interest-bearing arrangement might be possible for the borrower"s benefit, "Just not with signature/flagstar bank," and that "1031 is not an Iola account." Nussbaum reiterated this in a voice message in the same exchange.

85. Blueberry relied on these many assurances. However, Flagstar's statement on that day showed that the entire balance of the Trust Account, for all of its depositors combined, was $10,500,032.89, less than a third of Blueberry's $38,000,000.00 that Nussbaum said remained on deposit.

86. In fact, at no point in November did the Trust Account's balance exceed $13,504,714.03. Nonetheless, on November 30, 2023, the Trust Account wired $3,000,000.00 to Real Green Management Corp. ("Real Green"), a Steiner-affiliated entity, with the designation "steiner."

87. The parties also memorialized their arrangement in a formal written escrow agreement dated August 21, 2024. Nussbaum Lowinger LLP, was the "Escrow Agent." Blueberry was the "Grantee." Steiner was guarantor, and his companies, 446 Monroe LLC and 185 E. 33rd St. LLC were obligors. Nussbaum signed the agreement for the Escrow Agent on August 27, 2024.

88. The agreement stated that "the sum of $58,772,945 is being held in escrow by Escrow Agent." It provided that the funds "shall be deposited with and held by Escrow Agent until, at the latest, 12 PM Eastern Standard Time on August 31, 2027," and that, unless funds were

being returned to Blueberry, they could not be released without written consent by Blueberry and the obligors.

89. However, on August 21, 2024, the date of the escrow agreement, Flagstar's statement reflects that the entire balance of the Trust Account, for every client of the Law Firms combined, was $7,020,537.01.

90. On August 27, 2024, the day Nussbaum signed the agreement, the balance was $16,537,183.95, the highest it had reached all month.

91. But, on August 30, 2024, the Trust Account wired $770,000.00 to Aven Realty 1 LLC ("Aven"), another Steiner entity, with the designation "steiner." The "Escrow Agent" certified in writing that the Trust Account held $58,772,945 for Blueberry alone when that account never held a third of that sum.

92. By reason of the Escrow Agreement, Blueberry's funds had heightened safeguards. Not only were the funds deposited in a fiduciary account, every document underlying the loans expressly required it, and set forth the precise conditions upon which the funds could be used.

93. The funds were not ordinary deposits from the perspective of Flagstar, Nussbaum, and certainly not of Blueberry. Blueberry took all the steps it could to ensure that the money used to fund the Steiner loans was protected.

94. Before July 2023, Blueberry also used the Law Firms' escrow in the ordinary course of its private lending business, placing funds for short-term bridge loans, some of very brief duration, whose disbursement and return to Blueberry was authorized individually, loan by loan, and reconciled with Nussbaum on behalf of the "Escrow Agent" in writing.

95. Blueberry made those short-duration loans on Nussbaum's representation that they covered shortfalls faced by borrowers at the closing table in refinancing transactions, to be repaid

when the new lender's loan funded, ordinarily within a day or two. As it turned out, these representations were also false.

96. What Blueberry did not know was that Nussbaum had been utilizing money in the Trust Account in illicit "proof of funds" transactions that also involved short term withdrawals and redeposits. Nussbaum would transfer money to the account of a real estate purchaser to fool lenders (and others) that the buyer had sufficient liquidity to close a loan. As in bridge lending transactions, the funds could be returned in a day.

**III. Flagstar's Actions and the Blueberry Transfers**

97. Blueberry banked at Flagstar. The Law Firms banked at Flagstar. Every transaction between them began and ended with Flagstar.

98. Blueberry and its affiliate wired $15,500,000 from their own Flagstar accounts into the Trust Account in July and August 2023, at a time when Flagstar actually knew that Nussbaum was making impermissible transactions from the Trust Account.

99. On July 17, 2023, Blueberry's Flagstar account sent an outgoing wire of $8,000,000.00. Flagstar's statement to Blueberry for that month records the transaction as "OUTGOING WIRE 8,000,000.00, REF# 20230717B6B7261F001292, TO: NUSSBAUM LOWINGER LLP IOLA ACCOUNT, ABA: 026013576, BANK: FLAGSTAR BANK, NA, ACCT# 1504421550." The receiving side of the same transfer is recorded as 20230717B6B7261F00116307171046FT03. Flagstar generated both.

100. On August 24, 2023, the Flagstar account of Bluberry Capital, the affiliate of Blueberry, sent an outgoing wire of $7,500,000.00. Flagstar's statement records it as "OUTGOING WIRE 7,500,000.00, REF# 20230824B6B7261F001691, TO: Nussbaum Lowinger LLP, ABA: 026013576, BANK: FLAGSTAR BANK, NA, ACCT# 1504421550."

101. Signature and Flagstar used a single-point-of-contact private client model. The relationship manager for the Trust Account was Timothy Collins ("Collins"), Group Director and Vice President, who personally executed, tracked, and confirmed wires from the Trust Account.

102. Other relationship management officers and employees involved in the transactions here included Juan A. Esquilin ("Esquilin"), Mayra Martinez ("Martinez"), Claudell Charlemagne ("Charlemagne"), Molick Scott ("Scott"), Edna Rios ("Rios"), Ivelise Alicea ("Alicea"), Harish Pahuja ("Pahuja"), Bruce Burford ("Burford"), Rohini Bedasie ("Bedasie") and Ruth Rodriguez ("Rodriguez").

103. As documents reflect, these officers serviced the Nussbaum accounts at Signature and Flagstar after the acquisition. Thus, they possessed historical knowledge of Nussbaum, his accounts and the Trust Account activity.

104. Flagstar's compliance office repeatedly, and in writing, identified a multitude of suspicious transactions in both of the Law Firms' trust accounts, and sought documentation from Nussbaum to explain them. The relationship management officers knew of these demands, having been copied on nearly all of them.

105. Numerous suspicious transactions in the Trust Account were first flagged beginning in February 2023.

106. On February 27, 2023, Esquilin wrote to Nussbaum identifying six categories of transactions for which Flagstar could not account. These transactions included: (a) three check deposits totaling $3,459,046.94 from entities identified only by initials; (b) four checks totaling $888,480.86 paid to Ronald Lowinger referencing "Regency Unit 429;" (c) a $15,000,000 wire to LB Capital that came back the next day referencing only "Leo Brody;" and (d) unexplained internal transfers between the two Law Firms' trust accounts.

107. On February 28, 2023, Nussbaum responded, but dodged the questions, giving the same generic answer to each one. However, in answer to the question about the internal Law Firm account transfers, Nussbaum admitted that he maintained "a comingled account of client funds," and moved money between the two Law Firms' accounts to control what balance a client would see when the client "request[ed] a printout of their account balance."

108. Twelve days later, Signature was closed. Flagstar acquired the Law Firms' trust accounts, the account records containing that admission, and the personnel who knew about it.

109. On June 12, 2023, Esquilin, now at Flagstar, wrote to Nussbaum (copying Collins and Martinez) identifying a suspicious wire of $3,300,000.00 out of the Trust Account that was returned on the same day.

110. Esquilin wrote, "It appears the client remitted these funds back on the same day they were received." Nussbaum called it "proof of funds." Esquilin rejected that explanation, requested the purpose, source and destination of the returned funds, and asked Nussbaum to call. Nussbaum did not respond.

111. On July 17, 2023, only a month after the June 12, 2023 exchange, Blueberry wired $8,000,000 from its Flagstar account into the Trust Account.

112. At that point, Flagstar was actively monitoring and managing the Trust Account.

113. A mere ten days later, on July 27, 2023, Esquilin wrote to Nussbaum, copying Collins, Martinez and Charlemagne, advising that the compliance office and regulator flagged yet more suspicious transactions.

114. One of the transactions was a personal wire from the Trust Account to Nussbaum's mother. Another was a nearly $2,000,000 wire to a religious congregation. Compliance required detailed documentation demonstrating the propriety of these transactions.

115. Nussbaum answered on July 28, 2023 only in part. He confirmed that the recipient of one of the wires was his mother, described the funds as “return of interest” on loans she made to “clients of mine.”

116. Flagstar followed up on August 22, 2023, asking in what capacity Nussbaum’s mother was providing loans and for documentation of them. The record reflects no answer.

117. Flagstar now knew that Nussbaum was paying family members from client money in the Trust Account. Yet, Flagstar took no action, and continued processing transactions through the Trust Account uninterrupted.

118. On August 24, 2023, Bluberry Capital wired $7,500,000 (of Blueberry’s funds) from its Flagstar account into the Trust Account. This happened only two days after Flagstar’s August 22nd follow-up, and nearly four weeks after Nussbaum told the bank he was paying his mother from the Trust Account.

119. Flagstar followed up on its inquiries of Nussbaum again on August 25, 2023, but it was too late. Flagstar’s statements show what happened to Blueberry’s money next.

120. The trust account's balance was $20,795,365.80 at the close of August 24, 2023, the day Blueberry’s $7,500,000.00 arrived. Seven days later, at the close of August 31, 2023, the balance was $4,388,180.51. On that day alone, the account paid out more than $8,500,000.00, including $3,175,000.00 to a title agency's account at Flagstar itself, $2,426,138.00 to a title insurer, and $2,334,494.88 to a 1031 exchange intermediary. By September 20, 2023, the account that the parties’ loan documents required to hold Blueberry’s $15,500,000.00 held $859,895.74. Thus, since the entire balance of the Trust Account had fallen far below the $15,500,000.00 that Blueberry deposited, Blueberry’s money could not have still been in the account.

121. Undeterred by Nussbaum's apparent fraud and his refusal to answer basic questions concerning facially illegitimate transactions, Flagstar continued processing wires into and out of the Trust Account without question.

122. Flagstar knew from inception that Nussbaum's practice involved real estate transactions, and that the Trust Account's sole purpose was to safeguard client funds in connection with those transactions.

123. On their face, the flagged transactions had no relationship whatsoever to any real estate deals.

124. However, Flagstar did not follow even its own fraud escalation procedure after flagging the suspect transactions, that is, until JPMorgan Chase came knocking.

125. On October 27, 2023, JPMorgan Chase's fraud department flagged a $618,788.37 wire that Flagstar sent from the Trust Account, advising that it "does not fit in the normal pattern of our customer," and asking Flagstar to confirm "whether or not there is fraud involved."

126. Flagstar immediately routed this alert on the very same day to its Incident eReporting, Corporate Security and Wire Investigations departments, and to Nussbaum.

127. Flagstar knew the process for handling fraud alerts, but never once followed it in connection with the multitude of suspicious transactions that it flagged as it was actively monitoring the Trust Account.

128. Upon information and belief, as a result, suspicious and fraudulent transactions were concealed from upper-level compliance officers, and insulated from investigation.

129. This is the reason that Nussbaum chose to remain with Flagstar after its acquisition of Signature; that the Trust Account might not survive scrutiny elsewhere. On March 14, 2023,

two days after Signature was closed, Lowinger wrote to Nussbaum urging him to move their banking to JPMorgan private client. Nussbaum answered, "i dont think they will take me."

130. Nussbaum explained his scheme in a sworn affirmation filed on January 28, 2026 in ABCMN LLC v. Real Green Management Corp. and Aven Realty 1, LLC, Index No. 656436/2025 (Sup. Ct. N.Y. Cnty.), an ongoing asset recovery action on brought on behalf of the Law Firms.

131. Specifically, from mid-2022 until mid-2025, creditors deposited funds into the Law Firms' trust accounts (and other escrow accounts) maintained at Signature, Flagstar, and later Customers Bank, that he transferred approximately $336,731,000 of those funds to accounts at JPMorgan Chase held by the Steiner-controlled entities, Real Green and Aven, that there was no consideration or business reason for those transfers, that the depositors did not authorize, consent to, or know about them, and that new monies coming into the trust accounts were used to return original deposits.

132. For instance, in October 2024 alone, the Trust Account wired Aven $1,850,000 on October 15th, $6,500,000 on October 16th and $3,850,000.00 on October 29th, each with the designation "steiner." On October 29, 2024, the Trust Account also wired $20,150,000.00 to an account at Merrill Lynch to "Elizabeth Capital Success," under the same "steiner" designation. (This occurred after Flagstar had raised the account's wire limit to exactly that amount on the afternoon that Nussbaum requested it.)

133. At no point in the process did Flagstar restrict the Trust Account, freeze a transaction or condition continued activity on the documentation that its compliance department and regulators demanded.

134. Instead, the bankers servicing the Trust Account further facilitated the transactions by routinely raising wire limits to transfer ever-growing sums, and by otherwise keeping the money flowing.

135. The bankers had an incentive to accommodate Nussbaum. As he told Blueberry, the compensation of the officers who serviced his firms' accounts was based on deposits.

136. Thus, they apparently had a direct personal financial interest in continuing to process transactions in spite of facially illegitimate transfers, unanswered questions from the compliance department and a fraud alert from JPMorgan. (The officers' compensation arrangements, and Flagstar's internal decisions about this relationship, are peculiarly within Flagstar's possession and control.)

137. The relationship managers accommodated Nussbaum in other respects as well. They repeatedly raised the Trust Account's wire limits within minutes of a request, and did so without question.

138. On July 3, 2023, three weeks after the June 12th compliance letter, and with Flagstar's questions still unanswered, Nussbaum made a request to raise the limit to $16,000,000. In two minutes, Collins replied, "I will."

139. Collins even offered to keep the wire window open after hours, once asking, "Do you need time after 5:30?"

140. The practice continued even after JPMorgan's fraud alert. On August 6, 2024, a request to raise the limit to $13,635,000 was approved in twenty-one minutes with confirmation, "Limit has been increased."

141. On August 14, 2024, Alicea, who had been copied on the October 2023 JPMorgan fraud alert, confirmed a limit of $10,000,000 within minutes of a request, messaging Nussbaum, "You should be good to go."

142. On October 16, 2024, Vice President and Relationship Manager, Bruce Burford, approved a limit of $17,640,000 on the same morning it was requested, writing to Nussbaum, "Okay to proceed."

143. On October 29, 2024, in less than an hour, Alicea approved yet another limit increase, to $20,150,000, and confirmed, "Increase has been processed. You may proceed." Notably, the Trust Account wired exactly $20,150,000.00 out, under the designation "steiner."

144. Three of those limit increase approvals were followed the same day by eight-figure wires from the Trust Account into other Flagstar accounts. On May 23, 2023, a wire went out to a company named 529 Maple LLC for $13,130,000. On August 6, 2024, a wire of $13,635,000 went out (the exact amount of that day's approved limit). And, on August 14, 2024, a $10,000,000 wire went out (also the exact amount of that day's confirmed limit.)

145. The process was that Flagstar raised the limit, executed the wire, and received the funds into another of its own accounts.

146. Flagstar was aware of the interconnectedness of other Flagstar accounts through which the Trust Account funds moved. These entities were part of Nussbaum's scheme.

147. For instance, in June 2023, $3,820,187.77 intended for one closing was routed to the wrong recipient. The reversal of the transaction ran through an escrow account held by Meister Abstract Corp. at Flagstar. (Flagstar wire instructions for that account were contained in documents in Nussbaum's firm under the file name "Meister Abstract Escrow FLAGSTAR BANK.pdf.")

148. In September 2023, the Trust Account received legal-fee wires from Meister Abstract's Flagstar account, and paid seven-figure disbursements to two title agencies' accounts also at Flagstar.

149. In addition to this, Flagstar maintained a wide network of numerous related escrow accounts that included those of lenders, title agencies, law firms and borrowers. Flagstar accounts were the plumbing through which Nussbaum ran his scheme, such that Flagstar saw every aspect of an illicit transaction; something that no outside observer could see.

150. After the scheme began to fail, in the late summer and early fall of 2024, the Law Firms opened a new trust account and operating account at Customers Bank. Collins followed on January 8, 2025.

151. Upon information and belief, Collins arranged or facilitated the movement of the Nussbaum accounts to Customers, and later joined himself, because Nussbaum was a lucrative client that he wanted to retain, and he knew what the compliance findings at Flagstar revealed about the Nussbaum accounts.

152. Put in chronological order, Flagstar's records show what it knew before each of Blueberry's deposits: (a) on February 27, 2023, the bank's compliance officer wrote to Nussbaum about suspicious transactions in the trust accounts that the bank could not explain; (b) on February 28, 2023, Nussbaum admitted in writing that he moved funds between accounts to control the balances his clients were shown; (c) on March 20, 2023, Flagstar acquired the Trust Account and its file, and the same officers continued to service it; (d) on June 12, 2023, Flagstar's compliance department questioned a $3,300,000.00 same-day round trip withdrawal and redeposit through the Trust Account, rejected Nussbaum's explanation, and received no further answer; (e) on July 17, 2023, Blueberry wired $8,000,000.00 into the Trust Account; (f) on July 27 and 28, 2023, Flagstar

questioned wires from the Trust Account to Nussbaum's mother, and Nussbaum answered that they were "return of interest" on loans she made to "clients of mine"; (g) on August 22, 2023, Flagstar followed up and received no answer; and (h) on August 24, 2023, Bluberry Capital wired $7,500,000.00 of Blueberry's money into the Trust Account. Thus, Flagstar had Nussbaum's admission and a host of unanswered questions concerning suspect transactions before Blueberry's first deposit, and it knew about the wires to Nussbaum's mother before Blueberry's second. Flagstar accepted Blueberry's money anyway.

**IV. Flagstar's Duties to Blueberry**

153. Flagstar had a duty to act to protect funds in the Trust Account. Flagstar had actual knowledge that Nussbaum was diverting and misusing Trust Account funds in breach of his fiduciary duties.

154. For the same reason, Flagstar acted in bad faith in the face of Nussbaum's breach of his fiduciary duties. Flagstar and its officers had a financial interest in retaining Nussbaum as a client. This led them to assist in Nussbaum's diversion and misuse of the funds in the Trust Account, including those of Blueberry.

155. Flagstar had a separate duty to Blueberry as its customer. It held Blueberry's accounts, serviced the relationship, and executed Blueberry's wires into an account that Flagstar knew was being misused. The customer relationship with Blueberry gives rise to a duty of reasonable care independent of the terms of any deposit agreement or individual transaction.

156. Had Flagstar restricted the Trust Account, declined to accept further funds into it pending resolution of internal fraud alerts, escalated those internal alerts as it did when JPMorgan reported suspected fraud, or exited the relationship, Blueberry's July 17 and August 24, 2023 funds would not have been deposited to that account and stolen from it.

**V. Successor Liability and Timeliness**

157. This action does not seek to recover from Signature's receivership estate or for actions in which Signature engaged as a failed bank. It seeks to hold Flagstar liable for what Flagstar itself knew, and did, after it took over the Trust Account on March 20, 2023.

158. Claims against a bank which is neither the failed institution nor its receiver are not subject to the FDIC's administrative claims process. Flagstar cannot avoid answering for its own conduct by pointing to the bank it bought.

159. Every loss that Blueberry claims arose after March 20, 2023, and stems from Flagstar's own conduct after it acquired the account, the files and the officers from Signature. This included Nussbaum's written admission, the internal fraud alerts and compliance findings, the host of unanswered questions and JPMorgan's fraud alert of which the bank officers were aware.

160. In the alternative, and only to the extent any of Signature's own pre-acquisition conduct is at issue, Flagstar is liable for it as Signature's successor in interest, to the extent Flagstar assumed those liabilities when it acquired Signature's deposits.

161. The knowledge of the officers named in this Complaint is imputed to Flagstar. Those officers include Esquilin, who received Nussbaum's February 28, 2023 admission, and Collins and Martinez, who were copied on the bank's compliance correspondence about the Trust Account, serviced the Trust Account at Signature, and continued to service the same accounts at Flagstar after March 20, 2023.

162. They possessed that knowledge, and acted on behalf of Flagstar, when they accepted Blueberry's deposits and executed the Trust Account's wires.

163. Nothing Nussbaum knew is imputed to Blueberry because he acted entirely adversely to it. He held Blueberry's funds as escrow agent and looted them for his own purposes and those of his confederates, and he concealed from Blueberry facts disclosed to Flagstar.

164. Blueberry first learned that its escrowed funds were in jeopardy on January 14, 2025, when Lowinger wrote that the Trust Account "may have been illegally accessed and substantially depleted as a result of irregular transactions." Even then, the Law Firms blamed an outside intruder.

165. However, nothing suggested to Blueberry that the bank had known about the misuse of the Trust Account for nearly two years.

166. Blueberry did not know, and had no reason to know, of Flagstar's involvement in the events alleged here, including the internal and external fraud alerts that revealed the misuse of Trust Account funds occurring both before and during the time that Blueberry's funds were on deposit.

167. Flagstar's compliance correspondence did not become available to Blueberry until April 2026. Before that time, Blueberry had no knowledge of Flagstar's role in connection with Nussbaum's scheme.

## COUNT I
## Aiding and Abetting Breach of Fiduciary Duty

168. Blueberry repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

169. As escrow counsel entrusted with Blueberry's funds pursuant to the agreements detailed herein, Nussbaum, Lowinger and the Law Firms owed Blueberry a fiduciary duty to safeguard its funds, utilizing them only with Blueberry's express authorization and consent and for specific and limited purposes as set forth in the loan documents.

170. Nussbaum, Lowinger and the Law Firms breached that duty by *inter alia* misappropriating and diverting Blueberry's funds to enrich themselves and their collaborators.

171. For the reasons detailed herein, Flagstar had actual knowledge of, and participated in, the breach both affirmatively, by continuing to process transactions through the Trust Account at a time when it knew of the breach, and by its silence and inaction in the face of the breach. And, Flagstar's managerial personnel participated in and ratified that course of conduct.

172. As a direct and proximate result, Blueberry has suffered damages in an amount to be determined at trial.

## COUNT II
## Aiding and Abetting Fraud

173. Blueberry repeats and realleges each of the foregoing paragraphs as if fully set forth herein at length. This Count is pleaded in addition to, or in the alternative to, Count I

174. Nussbaum and Lowinger made material misrepresentations in soliciting Blueberry's funds, inducing it to enter into loan and escrow agreements requiring the funds to be held in the Trust Account, to be disbursed only with Blueberry's express authorization and consent and for specific and limited purposes, and thereafter, by misappropriating those funds.

175. Nussbaum, Lowinger and the Law Firms fraudulently utilized the funds for the illicit purpose to enrich themselves and their collaborators.

176. Flagstar affirmatively and repeatedly helped Nussbaum commit and continue his fraudulent scheme. It had actual knowledge of the fraud and, by its actions and inaction, provided substantial assistance and encouragement in furthering the fraud.

177. Flagstar identified a multitude of facially illicit transactions in the Trust Account while actively monitoring and managing it, made only half-hearted and/or knowingly ineffectual requests for information to justify those transactions, intentionally chose not to press Nussbaum

for proof of the propriety of those transactions, failed and refused to utilize the fraud escalation process thereby concealing the fraudulent transactions and insulating them from scrutiny or investigation, ignored Nussbaum’s admissions of fraud, and simply continued processing wires through the Trust Account.

178. Flagstar did so because *inter alia* Nussbaum was highly profitable to Flagstar and individual bank officers and employees whose compensation depended on his deposits. They had a financial interest in retaining Nussbaum as a client.

179. Flagstar could have, and should have, intervened, but failed to do so. It chose instead to assist Nussbaum's fraud.

180. As a direct and proximate result, Blueberry has suffered damages in an amount to be determined at trial.

## COUNT III
## Negligence

181. Blueberry repeats and realleges each of the foregoing paragraphs as if fully set forth herein at length.

182. Flagstar owed to Blueberry an independent and common law duty of reasonable care arising from the special relationship between Flagstar and Blueberry as its customer, separate and apart from any individual transaction executed on Blueberry's behalf.

183. Flagstar had actual knowledge of Nussbaum’s fraud, and acted in bad faith in failing to prevent it, both of which constitute a breach of that duty.

184. But for Flagstar’s failure to act, Blueberry’s funds would not have been stolen.

185. As a direct and proximate result, Blueberry has suffered damages in an amount to be determined at trial.

**COUNT IV**
**Unjust Enrichment**

186. Blueberry repeats and realleges each of the foregoing paragraphs as if fully set forth herein at length.

187. Blueberry conferred benefits on Flagstar through *inter alia* earnings from deposits Blueberry maintained at Flagstar, fees and charges assessed to Blueberry's accounts and wire transactions, the use and float of Blueberry's funds moving in and through the Trust Account and the deposit funding value of a trust-account relationship that moved tens of millions of dollars each month that Blueberry's funds helped sustain.

188. Blueberry is entitled to restitution in an amount to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Blueberry respectfully requests judgment against Flagstar as follows:

(a) compensatory damages in an amount to be determined at trial, but not less than $58,772,945.00, representing Blueberry's total unreturned losses from the scheme Flagstar aided and abetted; (b) on Counts I and II, punitive damages for Flagstar's actual malice and wanton and willful disregard of Blueberry's rights; (c) pre- and post-judgment interest; (d) restitution; (e) attorneys' fees and costs to the extent permitted by law; and (f) such other and further relief as the Court deems just and proper.

BLUEBERRY FUNDING, LLC

Dated: October 6, 2026

By: /s/ Michele Daitz

Michele A. Daitz, Esq. (1619)
Litigation Counsel
Blueberry Funding, LLC
957 Route 33, Suite 12 #322
Hamilton Square, New Jersey 08690
Ph. 732-236-2213
mdaitz@blueberryloan.com

## LOCAL CIVIL RULE 11.2 CERTIFICATION

Pursuant to Local Civil Rule 11.2, I certify that the matter in controversy is related to the following actions, which arise from the same attorney-trust-account scheme, but do not name Flagstar as a party: Blueberry Funding LLC, et al. v. Nussbaum, et al., Docket No. OCN-L-1380-26; Blueberry Funding LLC v. Chopp, et al., Docket No. OCN-L-2808-26; Blueberry Funding LLC v. Riverside Abstract, et al., No. 7:26-cv-04843 (S.D.N.Y.); and Blueberry Funding LLC v. Feller, et al., No. 1:26-cv-08262 (S.D.N.Y.). Other than these, the matter in controversy is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.

Dated: October 6, 2026 By: /s/ Michele Daitz

## LOCAL CIVIL RULE 201.1 CERTIFICATION

Pursuant to Local Civil Rule 201.1(d), I certify that Plaintiff seeks money damages in excess of $150,000, exclusive of interest, costs, and any claim for punitive damages, and that this action is therefore not appropriate for compulsory arbitration.

Dated: October 6, 2026 By: /s/ Michele Daitz
Michele A. Daitz, Esq.

## JURY DEMAND

Plaintiff seeks trial by jury as to all issues so triable.

Dated: October 6, 2026 /s/ Michele Daitz
Michele A. Daitz, Esq.